FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

2016 FEB -9  PM 12: 50

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

JEFFREY N. SELF,

                         **Plaintiff,**

-vs-                                                        Case No.  A-14-CA-618-SS

BNSF RAILWAY COMPANY,
                          **Defendant.**

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Plaintiff Jeffrey N. Self's Motion for Partial Summary Judgment [#20], Plaintiff's Memorandum in Support of His Motion for Partial Summary Judgment [#21], Defendant BNSF Railway Company's Response [#26] in opposition, Plaintiff's Reply [#29] in support, Defendant's Motion for Summary Judgment [#24], Plaintiff's Response [#25] in opposition, Defendant's Reply [#30] in support, Plaintiff's post-hearing Letter Brief [#33], Defendant's post-hearing Letter Brief [#34], and Defendant's Supplement to Its Motion for Summary Judgment Addressing Plaintiff's Application For and Receipt of Federal Railroad Retirement Disability Benefits [#35].  Having considered the documents, the governing law, the arguments of the parties during hearing, and the file as a whole, the Court now enters the following opinion and orders.

### Background

This is an employment discrimination case brought pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*  Plaintiff Jeffrey Self alleges his former employer, Defendant BNSF Railway Company, failed to reasonably accommodate Self's disability,

discriminated against him on the basis of his disability, and retaliated against him for exercising his right to request reasonable accommodations under the ADA.

Self worked for BNSF (and BNSF's predecessor, the Atchison, Topeka & Santa Fe Railway Company) as a journeyman carman/car inspector from 1994 until BNSF removed Self from service effective June 3, 2013. As a carman, Self was responsible for inspecting, maintaining, and repairing freight trains which arrived and departed from BNSF's train yard located in Temple, Texas. Self was also a member of the Brotherhood Railway Carmen labor union, and his employment was covered under a collective-bargaining agreement between BNSF and the union.

As a result of an on-the-job injury, in December 2012, Self, 57, underwent a right knee meniscectomy, a surgical procedure in which all or part of the meniscus, cartilage in the knee joint, is removed. Self had previously undergone the same surgery on his left knee in 2009. Beginning December 6, 2012, Self took a medical leave of absence from work for the meniscectomy, and remained absent from work for approximately four months. On April 3, 2013, Self's surgeon, Dr. Lichota, saw Self for a post-surgical follow-up and fitted Self with bilateral knee braces. *See* Def.'s Mot. Summ. J. [#24-3] Ex. C (Medical Records) at 001946. That same day, Self's surgeon cleared him to return to full-duty work without restrictions, effective April 8, 2013. *Id.* [#24-4] Ex. D-9.

As part of the return-to-work process, BNSF required Self to provide his pre-operative physician's report, along with other medical documents. *See id.* [#24-4] Ex. D-1 at 000070 (stating "the operative report as well as the last 3 clinic notes" were requested from Self on April 4, 2013). The pre-operative report notes, as part of Self's "History of Present Illness," that Self "does have sleep apnea, but he has not used his CPAP in well over a year." *Id.* [#24-1] Ex. A-1 at 1. Self was

diagnosed with sleep apnea in February 2008, over five years prior, and had no history of sleep-apnea-related issues at work.

BNSF reviewed Self's return-to-work documentation and found Self should be permitted to return to work subject to two restrictions: first, "he must wear bilateral knee braces," and second, "he must provide documentation that he is compliant with recommended [CPAP] treatment[,]" as "the untreated sleep apnea is a safety issue." *Id.* [#24-4] Ex. D-1 at 000069–70; Pl.'s Mem. [#21] Ex. B (explaining "provisional return to work" instructions).

Self returned to work on April 9, 2013. Under the terms of the collective-bargaining agreement (CBA), because Self's medical leave of absence lasted less than 180 days, he was required to return to his prior position—third-shift lead car inspector. However, because Self's regular duties as third-shift lead car inspector—including walking two to four miles per shift on uneven railroad ballast, squatting and stooping between railway cars, and climbing ladders—placed stress on his knees, Self immediately began seeking transfer to a different position. As will become relevant, of approximately 50 employees, Self was the fourth-most senior.

According to Self, during the period of time he was on medical leave, BNSF "*de facto* created a new position for an employee, . . . the 'second parts man' or 'second material man' position." Pl.'s Mem. [#21] at 6. Self alleges this position involved light work, such as stocking and ordering supplies, that involved little to no physical strain. As such, on April 10, 2013, Self formally requested a transfer to that position, as Self had greater seniority than the person presently holding it. *See* Def.'s Mot. Summ. J. [#24-1] Ex. A-4 at 70.[1] Self's request was rejected on grounds there

---

[1] Claiming "non-access," as referenced in the cited email, is the mechanism by which a senior employee who was on a medical leave of absence at the time a job was created may claim entitlement to the newly-created position over a junior employee.

was "no bulletin posted for a second material handling job," meaning the job did not exist. *Id.* at 69; *id.* [#24] at 4.

On April 17, 2013, BNSF informed Self he would be required to wear his knee braces on both knees at all times while on the property, including during his breaks from work. That same day, Self informed his superior, General Foreman Aaron Marshall, that the requirement he wear his braces at all times was "not in line with the recommendations given to me by my personal physician or the medical personnel that fitted me with the braces and instructed me in their use." *Id.* [#24-1] Ex. A-5 at 1929. Self noted wearing the braces for more than eight hours without a break would cause him "a lot of unnecessary pain and discomfort," which would be exacerbated by the amount of walking required by his third-shift lead car inspector position. *Id.*

In the same letter to Marshall, Self formally requested his "job be abolished and re-posted in order that I may exercise my seniority onto a job that is less physically demanding." *Id.* According to Self, a provision of the CBA governing his employment, Rule 27, "allow[ed] for this consideration and [] ha[d] historically been utilized for other employees here in Temple for similar reasons." *Id.* BNSF, however, disagreed with Self's interpretation of Rule 27, *see id.* [#24-1] Ex. A-7 at 74 (union representative advising Self Labor Relations disagreed with his interpretation of Rule 27), and on May 10, 2013, Marshall denied Self's request. *See id.* [#24-1] Ex. A-6 at 72. While the record is not entirely clear on this point, BNSF represents (and Self does not dispute) Self subsequently filed a grievance, which remains pending, regarding the correct interpretation of Rule 27. *See id.* [#24] at 4 ("Self disagrees with BNSF's interpretation of the applicable CBA rules and has a pending claim under the CBA regarding that dispute."), 11 ("Self has filed a claim under the CBA's grievance process concerning his interpretation of the various CBA rules he relied on.").

After Marshall denied his request, Self contacted Danny Lancaster, his national union

representative, to discuss the problem. During the course of a long discussion, Lancaster told Self:

> If [BNSF's] medical department has placed a greater requirement on you than your
> physician then please understand that you are not obligated to do so and can grieve
> the determination. I assume you accepted the conditions to return to work which is
> understandable. [BNSF] therefore is obligated to make reasonable allowances for
> your condition since they let you back to work after meeting and accepting their
> conditions. Please advise [BNSF] of your need for special and reasonable allowances
> for your documented medical condition created by your on the job injury.

*Id.* [#24-1] Ex. A-7 at 78. Later in his correspondence with Lancaster, on May 24, 2013, Self stated:

> [BNSF] is fully aware that I am no longer able to perform all of my duties in the train
> yard per company policy. I was very clear with [BNSF's] medical department that
> I couldn't get down on my knees, I couldn't squat, I can't climb ladders or stairs
> without pulling myself up with my arms (and now my shoulders are starting to hurt).
> I don't climb up and down on cars to tie or release handbrakes and have to shortcut
> as many processes as possible just to get through the shift. Aaron [Marshall] was
> made aware of the things above that I couldn't do when I returned and just said do
> the best you can.

*Id.* at 73.

On May 29, 2013, Self brought to work a note from Dr. Lichota confirming it was not

necessary for him to wear his knee braces while on break or working at a desk. *See id.* [#24-1] Ex.

A-9. When Self reported for work the following day, May 30, Self's immediate supervisor told him

he was nevertheless required to wear the braces for the entire shift because BNSF's medical

department had not yet indicated otherwise. *Id.* Ex. A-10 at 85–86. That prompted Self to write an

email to Marshall and Roy Jackson, Self's second-level manager, on May 31, 2013. Self's May 31

email stated in part:

> The medical department let me come back knowing full well that I was still having
> some problems . . . . I told you when I brought my release in from my doctor to come
> back to work that there were still things I couldn't do like squatting, getting up and
> down stairs and ladders without some difficulty, or putting weight on my knees.

-5-

*Id.* at 86.

While the precise date is not clear from the record, at some point during "the end of May, 2013," Manuel Cancel, another carman employed by BNSF, vacated his position as the second-shift mainline fuel pad car inspector. *See* Pl.'s Mem. [#21] Ex. 1 (Self Aff.) ¶ 50. Self, who had previously held the mainline fuel pad position, felt that position would be less strenuous on his knees; consequently, Self bid on the position. Self was the most senior employee to bid, and was therefore entitled to receive the position under the terms of the CBA.

On June 3, 2013—after both Self's email to Marshall and Jackson and Self's bid on the mainline fuel pad position—Jackson informed Self that, per the recommendation of BNSF's Medical Department, he would not be permitted to return to work pending clarification of the medical issues Self described in the May 31 letter. *See* Def.'s Mot. Summ. J. [#24-1] Ex. A-10 at 85. Self was thus removed from service and placed on involuntary medical leave. *See id.* Ex. A-11.

The parties differ in their explanations of how this affected Self's bid on the mainline fuel pad position. According to Self, the removal from service "prevented him from being awarded" the position. *See* Pl.'s Mem. [#21] at 7. According to BNSF, Self was awarded the job despite the involuntary leave of absence, and had Self returned to work within 180 days, would have done so as the mainline fuel pad car inspector. *See* Def.'s Letter Brief [#34] at 2.

On June 27, 2013, while on involuntary medical leave, Self consulted with his surgeon regarding his "continued right knee pain" and scheduled a second surgery for July 15, 2013. *See* Pl.'s Resp. [#26-1] Ex. 14 at 34. In his letter informing BNSF of the second surgery, Self stated "I decided to have the procedure repeated since I was being held off of my job." *Id.* at 33. During the June 27, 2013 visit, Self's surgeon instructed Self "not to perform any heavy lifting, pushing, pulling,

bending, squatting, jumping, kneeling, crawling, or climbing" and "to limit walking and standing as tolerated." *Id.* at 34.

On July 2, 2013, BNSF sent Self a letter "to clarify what you need to do in order to return to work[.]" Def.'s Mot. Summ. J. [#24-1] Ex. 12 at 89. BNSF informed Self he would need to (1) send BNSF the medical documentation related to his (upcoming) second knee surgery, and (2) concerning his sleep apnea, provide either evidence he was using a CPAP or the results of a sleep study. *Id.* Over the next several months, BNSF and Self traded quite a bit of correspondence; to simplify, while Self provided all of the documentation related to his second knee surgery, *see id.* Ex. 19 at 102, he refused to provide evidence he was using a CPAP or the results of a second sleep study, as he maintained he had no symptoms of sleep apnea after making significant diet and lifestyle changes. *See id.* Ex. 18 at 97; *id.* Ex. 19 at 102; *id.* Ex. 21 at 111; *id.* Ex. 23 at 114. In support of that claim, Self provided the pre-operative notes from a physician who examined him prior to his first knee surgery, which state although Self had a "[p]ast history of benign esophageal stricture," he was "asymptomatic at this time." *Id.* at 101.

Self filed a charge of discrimination with the EEOC on September 6, 2013. *See* Def.'s Mot. Summ. J. [#24-1] Ex. A-30. The charge alleges discrimination based on disability and retaliation, and specifically alleges Self "ha[s] been denied a reasonable accommodation in that [he] was not allowed to be moved to another position and pulled out of service." *Id.* Self further states in the charge he believes he has been discriminated against "because of my disability," because of his "record of a disability,"[2] and by being "regarded as disabled." *Id.*

---

[2] To the extent Self raises a claim based upon an alleged "record of a disability," it is DISMISSED, as Self has plead no factual allegations in support of such a claim.

A few months after filing his charge of discrimination, Self applied for Disabled Employee Annuity Benefits through the Railroad Retirement Board (RRB). While the related documentation BNSF has provided is confusing and out-of-order, as far as the Court can discern, the timeline was as follows. Self applied for a disability annuity on November 7 or November 8, 2013. *See id.* [#24-6] at 12, 3, 16 ("Application and Form Transmittal" with "filing date" of November 8, 2013; "Application Summary and Certification" signed by Self on November 7, 2013). On May 9, 2014, the RRB sent Self a letter informing him he met the requirements for a disability annuity and "establish[ing] a railroad retirement disability onset date" of June 2, 2013.[3] *Id.* at 23.

On July 22, 2014, the RRB informed Self that in addition to "making a disability decision under the Railroad Retirement Act, we also decide if you are disabled under the Social Security Act," and requested Self schedule an in-person medical evaluation for that purpose. *Id.* at 22. The evaluation was conducted on October 29, 2014. *See id.* at 19. On November 8, 2014, the RRB told Self his "condition me[t] the Social Security Act definition of disability" and that "[a] disability freeze," the Social Security Act's term for a period of disability,[4] had been established for Self effective June 2, 2013. *Id.* at 18.

Self initiated this action by filing suit on July 3, 2014. *See* Compl. [#1]. In his complaint, Self claims BNSF discriminated and retaliated against him on the basis of his disability, failed to reasonably accommodate his disability, and discriminated against him on the basis of a perceived

---

[3] A May 21, 2014 letter informed Self his "annuity beginning date" was December 1, 2013, and he would receive all back payments due. *See* Def.'s Mot. Summ. J. [#24-6] at 1. The disability onset date and annuity beginning date are different because "a disability annuity cannot begin earlier than the first day of the sixth month following the month in which the onset of disability occurs[.]" *Id.* at 23.

[4] *See* Social Security Administration, DI 25501.240 Disability Freeze and Established Onset, Program Operations Manual Systems (POMS), https://secure.ssa.gov/poms.nsf/lnx/0425501240.

disability (sleep apnea). *See* Compl. [#1] ¶ 25. The instant cross-motions for summary judgment and partial summary judgment followed, and are now ripe for decision.

## Analysis

### I.     Legal Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are

not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*

"Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

**B.     The ADA**

The ADA prohibits covered employers from discriminating "against a qualified individual on the basis of disability[.]" 42 U.S.C. § 12112(a). To make out a prima facie case of discrimination under the ADA, the claimant must establish: (1) he was disabled within the meaning of the ADA; (2) he was a "qualified individual"; and (3) he suffered an adverse employment action because of his disability. *See id.* §§ 12102, 12112; *Carmona v. Sw. Airlines Co.* (*Carmona II*), 604 F.3d 848, 854 (5th Cir. 2010).

A person is disabled within the meaning of the ADA if he has "a physical . . . impairment that substantially limits one or more . . . major life activities," "a record of such impairment," or "is regarded as having such an impairment." 42 U.S.C. § 12102(2). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of

the employment position that such individual holds or desires." *Id.* § 12111(8).   Reasonable

accommodations "may include . . . job restructuring, part-time or modified work schedules,

reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other

similar accommodations[.]" *Id.* § 12111(9).

Once the plaintiff has made his prima facie case, the burden shifts to the employer to

articulate a legitimate, non-discriminatory reason for the adverse employment action. *McInnis v.*

*Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 280 (5th Cir. 2000). Once the employer articulates such a

reason, the burden then shifts back upon the plaintiff to establish by a preponderance of the evidence

that the articulated reason was merely a pretext for discrimination. *Id.*

## II.   Application

It is undisputed that Self's knee impairment constitutes a disability. Further, to the extent

Self is required to show his sleep apnea is a "disability" under the ADA in order to maintain a claim

based on BNSF's allegedly discriminatory medical inquiries concerning his sleep apnea,[5] it appears

BNSF does not dispute it "regarded" Self's sleep apnea as disabling. *See* Def.'s Mot. Summ. J.

[#26] at 16–18.

BNSF argues it is entitled to summary judgment because: (1) Self failed to exhaust his

administrative remedies on several of his claims; (2) Self is estopped from claiming he was a

"qualified individual"; (3) transfer to an occupied position is not a reasonable accommodation; (4) an

employer is permitted to inquire into an employee's ability to perform his job; and (5) requiring Self

---

[5] "The Fifth Circuit has not decided whether a non-disabled individual may sue under Section 12112(d), and there is a split of authority on the issue." *Franklin v. City of Slidell*, 936 F. Supp. 2d 691, 714 (E.D. La. 2013) (citing *Fuzy v. S & B Eng'rs & Constr., Ltd.*, 332 F.3d 301, 303 (5th Cir. 2003)); *see also Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) ("[Section 12112(d)(4)(A)] applies to all employees, regardless of whether the employee has an actual disability.").

to wear knee braces was not an adverse employment action. Self has cross-moved for partial summary judgment on his claims based on (1) his removal from service allegedly pending clarification regarding his knee problems, and (2) BNSF's request for additional medical information or testing regarding his sleep apnea diagnosis.

As set forth below, the Court finds Self exhausted his administrative remedies for all of his claims save his retaliation claim, which is dismissed, and Self is not estopped from claiming he was a qualified individual. Substantively, the Court concludes genuine issues of material fact preclude summary judgment on Self's discrimination claim based on his removal from service pending clarification regarding his knee problems. BNSF is entitled to summary judgment on all other claims.

## A.    Failure to Exhaust

BNSF argues this Court should not consider Self's claims of discrimination for requiring him to (1) wear knee braces at all times during the workday and (2) undergo sleep apnea testing because those claims are not included in Self's EEOC charge and are therefore unexhausted.[6] Additionally, BNSF contends although Self checked the "retaliation" box on his EEOC charge form, his retaliation claim is unexhausted because he did not include any facts related to retaliation in the charge. Self responds "that the broad language of [his] charge encompasses all of [his] contentions in this lawsuit," and thus that he exhausted all his claims. Pl.'s Resp. [#25] at 2.

A plaintiff asserting a claim against his employer under the ADA must exhaust his administrative remedies before filing suit. *Dao v. Auchan Hypermarket*, 96 F.3d 787, 788–89 (5th

---

[6] BNSF also argues Self has raised an unexhausted claim based on BNSF's "refusing to return [Self] to service." Compl. [#1] ¶ 26; Def.'s Mot. Summ. J. [#24] at 10. To the extent necessary, the Court finds this allegation does not raise a claim distinct from Self's claim of discrimination based on his removal from service.

Cir. 1996). The ADA incorporates by reference the procedures for exhaustion applicable to Title VII claims. *See* 42 U.S.C. § 12117(a); *Franklin v. City of Slidell*, 936 F. Supp. 2d 691, 709–10 (E.D. La. 2013). To reconcile the competing considerations of protecting claimants versus triggering the EEOC's investigatory procedures and fostering non-judicial resolution of claims, EEOC complaints should be construed "broadly but in terms of the administrative EEOC investigation that can reasonably be expected to grow out of the charge of discrimination." *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008) (internal quotes omitted). In other words, an ADA action may include allegations "like or related to allegations contained in the EEOC charge and growing out of such allegations during the pendency of the case before the [EEOC]." *Id.* (internal quotes and alterations omitted).

The Court finds Self's claims concerning the requirement he wear knee braces and the sleep apnea testing were properly exhausted, as those charges are both "like or related to" Self's allegations, contained in the charge, that he was "pulled out of service," "regarded as disabled," and that BNSF "need[ed] further clarification regarding [his] disability." *See* Def.'s Mot. Summ. J. [#24-1] Ex. A-30. Facts about those challenged claims would be discovered in the course of an investigation into the reasons Self was "pulled out of service" and attendant circumstances.

However, the Court agrees with BNSF that Self's retaliation claim is unexhausted. While Self checked the box marked "retaliation," he failed to allege any specific facts concerning retaliation; most notably, Self failed to describe, or even mention, what protected activity he engaged in that led to the retaliation and what retaliatory conduct occurred. "[T]he Court does not accept that merely checking the retaliation box is sufficient to exhaust .... Plaintiff's failure to allege *any* facts concerning retaliation ... that would have put the EEOC on notice about the possibility of such, are

fatal to th[is] claim." *Givs v. City of Eunice*, 512 F. Supp. 2d 522, 537 (W.D. La. 2007) (citing *Randel v. Dep't of Navy*, 157 F.3d 392, 395 (5th Cir. 1998)).

Self's retaliation claim is therefore dismissed for failure to exhaust administrative remedies. The remainder may proceed.

**B.     Whether Self Is Judicially Estopped from Claiming He Was a Qualified Individual**

BNSF next contends Self is judicially estopped from claiming he was a "qualified individual" within the meaning of the ADA. Specifically, BNSF argues the RRB, in making its disability benefits determination and in finding Self entitled to a disability freeze under the Social Security Act, found Self was unable to perform his duties as a carman as of June 2, 2013, estopping Self from claiming he was a qualified individual as of that date.

The Supreme Court specifically considered the effect of an employee's application for disability benefits on his ability to prove he is a "qualified individual" for purposes of the ADA in *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999). In *Cleveland*, the Court considered whether and to what extent a worker's application for and receipt of Social Security disability benefits (SSDI) judicially estopped her ability to bring an ADA claim. *Id.* at 798. Below, the Fifth Circuit had affirmed the district court's grant of summary judgment for the defendant, reasoning an ADA plaintiff's "representation to the SSA [Social Security Administration] that she was totally disabled created a rebuttable presumption sufficient to judicially estop her later representation that, for the time in question, with reasonable accommodation, she could perform the essential functions of her job." *Id.* at 802 (internal quotations omitted).

The Court vacated the Fifth Circuit's decision and remanded. As the Court explained, the standards for determining disability under the ADA and Social Security Act are different, most

significantly because the Social Security Act "does *not* take the possibility of 'reasonable accommodation' into account[.]" *Id.* at 803.  Thus, the Court found, "an ADA suit claiming that the plaintiff can perform her job *with* reasonable accommodation may well prove consistent with an SSDI claim that the plaintiff could not perform her own job (or other jobs) *without* it." *Id.*  To distinguish cases such as this from those where ADA claims are precluded by assertions of total disability for benefits purposes, the Court articulated a test:

> When faced with a plaintiff's previous sworn statement asserting "total disability," or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim.  To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*Id.* at 807.

In *McClaren v. Morrison Management Specialists, Inc.*, 420 F.3d 457, 466 (5th Cir. 2005), the Fifth Circuit placed a finer point on the type of explanation *Cleveland* requires by comparing two of its own holdings applying the *Cleveland* test: *Reed v. Petroleum Helicopters*, 218 F.3d 477 (5th Cir. 2000), and *Giles v. General Electric Co.*, 245 F.3d 474 (5th Cir. 2001).  In *Reed*, the plaintiff was found to be judicially estopped from claiming she was a qualified individual "because she made specific, factual statements to the SSA that were fundamentally inconsistent with her ability to perform her job, with or without accommodation." *McClaren*, 420 F.3d at 466 (citing *Reed*, 218 F.3d at 480).  In *Giles*, by contrast, the plaintiff was found not judicially estopped, as his disability benefits application contained "no specific assertions resisting his explanation that he could perform his job with reasonable accommodation." *Id.* (quoting *Giles*, 245 F.3d at 485).  The *McClaren* panel thus explained that an ADA plaintiff will be estopped from arguing she is a qualified individual "in

those cases, like *Reed*, where the plaintiff's factual descriptions supporting disability [in his benefits application] preclude the possibility of qualification as of a certain date." 420 F.3d at 466.

BNSF argues Self has failed to provide any explanation whatsoever of the inconsistency between his application for RRB disability benefits and his current claim he is a qualified individual. The Court cannot agree. While it is true Self does not explicitly draw a link between his arguments and his disability benefits application, Self does maintain he could have performed his job with the accommodation of transfer to the mainline fuel pad car inspector position vacated by Manuel Cancel, as that position was less strenuous than his position as lead car inspector. Although, as BNSF points out, both positions are "carman" positions, transfer to a less demanding, vacant carman position could render Self a qualified individual under the ADA despite his claim for disability benefits.

Further, the statements Self made in his benefits application are more similar to *Giles* than *Reed*. As in *Giles*, Self's application for disability benefits does not describe specific symptoms which, if accepted as true, would render him unable to perform his duties. In fact, the information Self provided is highly general: his application summary[7] simply states "I am applying for a benefit based on being disabled." *See* Def.'s Suppl. [#35-1] Ex. 1 at 001487. Self's application contains no specific factual assertions contravening his explanation he could perform a less strenuous position—the mainline fuel pad position.

Searching for the type of specific factual averment a finding of judicial estoppel requires under the circumstances, BNSF points to the definition of "permanently disabled" contained in a benefits handbook Self acknowledged he "received and reviewed." *See id.* at 001490; *id.* [#35-2]

---

[7] No more comprehensive application paperwork is in the record before the Court. BNSF cites to this document as Self's benefits application. *See* Def.'s Suppl. [#35] at 4. The Court therefore treats it as such.

Ex. 2 at 23 ("To be permanently disabled, you must have a permanent medical condition that prevents you from working. . . . You are considered unable to work if your condition prevents you from performing basic work activities. . . . such as: walking, standing, sitting, lifting, . . . using judgment . . . , [and] dealing with changes in the work setting."). The Court declines to find a plaintiff's acknowledgment he has "received and reviewed" a definition, which is itself quite general, is the type of specific factual assertion precluding an ADA claim.

The Court therefore concludes, under *Cleveland* and *McClaren*, that Self is not judicially estopped by his RRB disability benefits application from claiming he is a qualified individual under the ADA.

## C.     Whether Self Is a Qualified Individual

Setting estoppel aside, the parties' dispute over whether Self could perform the essential functions of his position with or without a reasonable accommodation remains. BNSF argues Self's own admissions in the letters he wrote to management and his union confirm he was unable to perform his duties without an accommodation, and the only accommodations Self has identified or requested are unreasonable or would not enable Self to perform the essential functions of his position. Thus, BNSF concludes, Self is not a qualified individual.

Self's briefing on the qualified individual point is, perhaps intentionally, somewhat opaque. It appears Self disputes both aspects of BNSF's argument, although Self stops short of ever simply and plainly stating whether he could or could not have performed his duties as a carman *without* a reasonable accommodation. *See, e.g.*, Pl.'s Mem. [#25] at 4 ("Plaintiff had already successfully performed [] all of the duties of the manifestly *more* strenuous third shift train yard lead freight car inspector job for 8 weeks, although with a level of pain he had reported to BNSF which was in part

-17-

due to his . . . duties and in part due to BNSF's requirement that he wear knee braces constantly[.]"). In any event, it appears to the Court there is no genuine issue of fact that *without* a reasonable accommodation, Self was unable to perform his duties. "An employee who states []he can no longer do the job disqualifies h[im]self," *Cannizzaro v. Neiman Marcus, Inc.*, 979 F. Supp. 465, 472–73 (N.D. Tex. 1997) (citing *Howard v. N. Miss. Med. Ctr.*, 939 F. Supp. 505, 509–10 (N.D. Miss. 1996)), and Self did just that. On May 24, 2013, Self affirmatively stated "[BNSF] is fully aware I am no longer able to perform all of my duties in the train yard," and noted he "ha[d] to shortcut as many processes as possible just to get through the shift." Def.'s Mot. Summ. J. [#24-1] Ex. A-7 at 73. Self acknowledged he was unable to perform his duties, at least in the absence of an accommodation.

Apparently contending he could perform the duties of lead car inspector without an accommodation, Self cites the following excerpt from his own deposition regarding an "ops test," a type of safety evaluation of an individual employee conducted by a member of management, that Self allegedly passed just before BNSF removed him from service:

> Q.   Okay. So you said: I'm no longer able to perform all of my duties. Correct?
>
> A.   There's things I couldn't do, correct.
>
> Q.   Okay. You felt like even though there were things you couldn't do, you were still doing the job overall?
>
> A.   Well, to their satisfaction, yes. I mean, I had a supervisor come out and observe me and write me an ops test the night before they pulled me out of service and tell me I was doing a good job.
>
> Q.   What did he observe you doing for that ops test?
>
> A.   Inspecting, running their tests. I don't know what all he stood there and observed.

Pl.'s Resp. [#25, pp. 20–73] (Self Dep.) at 135:16–136:2.

The Court finds this testimony does not create a fact issue on the question whether Self could perform the duties of the lead car inspector position without a reasonable accommodation. Although Self has submitted an "Employee Safety Record Summary" showing ops tests he passed from 2009 through November 2012, *see* Pl.'s Mem. [#21] Ex. 1-D at 1, no similar document in the record memorializes any June 2013 ops test. Additionally, Self offers no sworn statement from a supervisor in corroboration, and while Self references the 2009–2012 ops tests in his own affidavit, there is no mention of an ops test performed the night before he was removed from service. *See id.* [#21] Ex. 1 (Self Aff.) ¶ 26.

The question thus becomes whether Self could perform the essential functions of the lead car inspector position with a reasonable accommodation. Self identifies three allegedly reasonable accommodations BNSF failed to provide: (1) reassignment to the "second material man" position, which was at that time held by a different employee; (2) abolishment and re-bulletining of Self's position so he could exercise his seniority to "bump" into a different position held by a junior employee; and (3) reassignment to the mainline fuel pad position.

"For the accommodation of reassignment to be reasonable, it is clear that a position must first exist and be vacant." *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997). Courts in this and other Circuits have repeatedly recognized the ADA does not require an employer to reassign an employee to an occupied position or "bump" another employee to create a vacancy. *See, e.g.*, *Foreman*, 117 F.3d at 810; *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1175 (10th Cir. 1999); *Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1019 (8th Cir. 2000); *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284,

1305 (D.C. Cir. 1998); *Neiman Marcus*, 979 F. Supp. at 475; *Munoz*, 926 F. Supp. at 608; *Jordan v. Crossroads Util. Serv., LLC*, No. 1:14-CV-373-LY, 2015 WL 4724803, at *7 (W.D. Tex. Aug. 10, 2015) (slip op.). Under all of these decisions, Self's first two requested accommodations are thus unreasonable as a matter of law.   Assuming BNSF did in fact create a "second material man" position, which BNSF disputes, there is no dispute the "duties" of that alleged position were, at the time, being performed by a different employee. *See* Pl.'s Mem. [#21] at 6 ("[BNSF] . . . created a new position for an employee, Joe Greer . . . Plaintiff expressly requested [BNSF] to accommodate him by awarding him the job, because of his seniority over Joe Greer[.]").   Similarly, had Self's position been abolished and re-posted, he would have used his seniority to "bump" a junior employee out of the position that junior employee held.   Neither position was vacant, and thus, neither request was a reasonable accommodation.

However, it is worth noting that in a workplace governed by a seniority system, as the Seventh Circuit has acknowledged in dicta, "few positions are ever truly 'vacant,' in the sense of being unfilled.   Rather, positions held by less senior employees are open to be bid upon and acquired by more senior employees . . . .   Within such a framework a 'vacant position' would essentially be one that an employee could acquire with his seniority and for which he could meet the job requirements." *Eckles v. Consol. Rail Corp.*, 94 F.3d 1041, 1047 (7th Cir. 1996); *but see Duvall v. Ga.-Pac. Consumer Prods. L.P.*, 607 F.3d 1255, 1262–64 (10th Cir. 2010) ("[A] position is 'vacant' . . . if it would be available for a similarly-situated non-disabled employee to apply for and obtain[.]").   Additionally, while it is true the ADA does not require an employer to reassign a disabled employee when doing so would violate another employee's rights under a collectively-bargained, bona fide seniority system, *see U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 393–94

-20-

(2002), here it is undisputed Self would have exercised his seniority rights to bump a junior employee, as permitted by the CBA.[8] But given the absence of briefing on the issue whether a position held by a junior employee is "vacant" within the meaning of the ADA vis-à-vis a disabled senior employee and the lack of any statement on that topic from the Fifth Circuit, the Court believes the best course of action is to leave that question for another day.

The Court accordingly turns to Self's request he be reassigned to the mainline fuel pad position vacated by Cancel.   BNSF suggests this should not be characterized as an "accommodation," as bidding on and assignment of the position was governed by the rules of the seniority system. The Court agrees. An "accommodation" is a "[m]odification[] or adjustment[] to the work environment," something which falls outside the norm. *See* 29 C.F.R. § 1630.2(o)(1)(ii) (defining "reasonable accommodation").  Resolution of this issue, however, ultimately has no effect on the analysis, as the question can simply and properly be re-framed as whether or not Self could have performed the essential functions of the position he desired—the mainline fuel pad position. *See* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as one who can, with or without reasonable accommodation, perform the essential functions of the position he holds "or desires").

---

[8] If a position held by a junior employee was technically "vacant," that raises another question concerning Self's second requested accommodation—namely, whether abolishing and re-posting Self's job would itself have violated the CBA. As previously noted, the parties are involved in an ongoing CBA grievance proceeding concerning that question. *See* Def.'s Mot. Summ. J. [#24] at 4, 11. Assuming, again, the possibility a position held by a less-senior employee was "vacant" for ADA purposes, the question whether abolishing and re-posting violates the CBA—which, importantly, includes the question whether BNSF had an unwritten "practice, usage, [or] custom" of doing so—would be dispositive of Self's claim. *See Barnett*, 535 U.S. at 405–06 (holding a requested accommodation which would violate the rules of a seniority system is unreasonable unless the plaintiff can present evidence of special circumstances, such as a regular practice of making exceptions to the system). Consequently, under those circumstances, Self's failure-to-accommodate claim based on the failure to abolish and repost his position would be precluded by the Railway Labor Act. *See Carmona v. Sw. Airlines Co.* (*Carmona I*), 536 F.3d 344, 347–48 (5th Cir. 2008) (disputes which "may be conclusively resolved by interpreting" the CBA "are exclusively within the jurisdiction of RLA adjustment boards").

In the opinion of the Court, genuine factual questions as to Self's ability to perform the essential functions of the mainline fuel pad position preclude summary judgment for either party. These questions are made more acute by the parties' lack of clarity concerning what the essential functions of the mainline fuel pad position actually are. BNSF argues the mainline fuel pad position involves "physically strenuous activities" similar to the lead car inspector position Self already occupied, and appends Marshall's sworn testimony Self was not qualified to perform "any Carman job, including the Mainline Fuel Pad Inspection job." Def.'s Resp. [#26-1] Ex. E (First Marshall Decl.) ¶ 5; *see also id.* [#26-6] Ex. F (Clark Aff.) ¶ 12; *id.* [#26-7] (Gillis Aff.) ¶¶ 8–9. Self, who previously worked as a mainline fuel pad inspector, has submitted a competing affidavit. Self swears the mainline fuel pad inspector job was "much less physically demanding and much less stressful—particularly with regard to walking, bending, crouching and kneeling" because, among other reasons, inspections are performed from a vehicle rather than on foot, the crouching and bending over associated with coupling air hoses is eliminated, and the climbing up onto freight cars is eliminated. Self Aff. ¶ 49.

The Court declines BNSF's rather unimpressive invitation to infer the lead car inspector and mainline fuel pad positions are functionally identical merely because they are both performed by carmen. The evidence at trial may show the lead car inspector and mainline fuel pad positions had materially different duties or were performed in materially different fashions. Or, it may not. The ADA, however, certainly contemplates movement to a less strenuous species of the same occupational genus as a reasonable accommodation for a employee's disability. On this limited record, and in light of these two affidavits, the Court declines to resolve the issue as a matter of law. The parties are cautioned a more particularized analysis will be expected at trial.

-22-

**D.     Whether BNSF Discriminated Against Self**

Assuming for the sake of argument that Self can prove he is a qualified individual, the Court turns to Self's individual claims.

**1.     Removal from service pending clarification of knee issues**

Self's core claim is that BNSF discriminated against him by placing him on involuntary medical leave pending clarification of his knee issues just before he would have been awarded the mainline fuel pad position.[9] The ADA's "prohibition against discrimination . . . include[s] medical . . . inquiries." 42 U.S.C. § 12112(d)(1). Section 12112(d)(4)(A) of the ADA provides that an employer "shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such . . . inquiry is shown to be job-related and consistent with business necessity." *Id.* § 12112(d)(4)(A). In general, section 12112(d)(4)(A) "prohibits employers from using medical exams as a pretext to harass employees or to fish for non-work-related medical issues[.]" *City of Slidell*, 936 F. Supp. 2d at 712 (quoting *Brownfield v. City of Yakima*, 612 F.3d 1140, 1140 (9th Cir. 2010)).

Although the prohibition contains an exception for business necessity, that standard "is not to be confused with mere expediency." *Id.* (quoting *Brownfield*, 612 F.3d at 1146). An inquiry that is job-related and consistent with business necessity "must, at minimum, be limited to an evaluation of the employee's condition only to the extent necessary under the circumstances to establish the employee's fitness for the work at issue." *Id.* (quoting *Tice v. Centre Area Transp. Auth.*, 247 F.3d

---

[9] As BNSF points out, Self's describes this claim in a rather confusing fashion, leaving it unclear whether the adverse action he challenges is the failure to reassign him to the mainline fuel pad position as an "accommodation" or the removal from service pending clarification of his medical issues. The Court believes the adverse action is most appropriately conceptualized as BNSF's removal of Self from service pending clarification of his ability to perform his job, not as the failure to accommodate him through reassignment. *See supra* section II.C.

506, 515 (3d Cir. 2001)).   However, "the business necessity standard may be met before an employee's work performance declines if the employer is faced with significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Id.* (quoting *Brownfield*, 612 F.3d at 1146).

BNSF contends it was justified in removing Self from service pending clarification regarding Self's ability to perform his duties because, in the May 31 email, Self called his ability to work safely into question. *See* Def.'s Mot. Summ. J. [#24-1] Ex. A-10 at 86 (Self's statements he "couldn't do . . . squatting, getting up and down stairs and ladders without some difficulty, or putting weight on [his] knees" and was "still taking pain pills," albeit not at work).   Additionally, according to Dr. Sharon Clark, BNSF's Medical Department officer who made the recommendation Self be removed from service, neither "the severity of Mr. Self's job-performance issues" nor Self's "use of prescription pain medication" were known to the Medical Department until Clark read the May 31 email. *Id.* [#24-5] Ex. E (Clark Decl.) ¶ 11.

Attempting to demonstrate BNSF's stated reason for removing him from service at that time was pretextual, Self vigorously disputes the contention the May 31 email provided BNSF with any information it did not already have.   Self points to the medical documentation he provided BNSF when it approved him to return to service in April 2013, including Self's surgeon's comments that Self "may have a recurrent medical meniscus tear," "does still have the arthritic issue," and "[b]oth knees are kind of achy." *Id.* [#24-3] Ex. C at 25.   Self further indicates internal BNSF logs written by Dana Joseph,[10] a Medical Department manager, show BNSF was already aware of his ongoing problems. *See* Def.'s Resp. [#26-8] Ex. H-1 at 16 ("He . . . takes Ibuprofen when needed. . . .   He

---

[10] Dana Joseph is referred to elsewhere in the pleadings and exhibits as "Dana Cahill" or "Dana Dickey."

does have occasional pain."), 15 ("The braces are causing him a little discomfort . . . . He also said the weather causes him discomfort.").

The Court concludes there is a genuine issue of fact on the question whether BNSF's decision to place Self on involuntary leave pending further information about his medical condition was pretextual or motivated by business necessity. While it seems to the Court Self's evidence regarding BNSF's prior knowledge of his issues is rather thin and perhaps in other respects even hurtful to his case, *see id.* at 16 (indicating in April 2013, Self specifically informed BNSF "he [wa]s not on prescription medication"), Self has submitted at least some evidence rebutting BNSF's claim it did not know about Self's limitations prior to May 31. *Cf. Tice*, 247 F.3d at 517 (affirming summary judgment for the employer where the employer submitted "ampl[e]" evidence its medical examination requirement was consistent with business necessity and the plaintiff "submitted virtually no evidence of his own in rebuttal"). If, as Self claims, BNSF was fully aware of Self's limitations upon clearing him for duty in April 2013—and, importantly, nothing indicated to BNSF Self's issues had become more severe in the interim—the jury is entitled to infer BNSF's decision to remove Self from service pending receipt of more medical information following the May 31 letter was a pretext for discrimination. Weighing the evidence is the province of the jury, not the Court, and Self has adduced sufficient evidence from which a reasonable juror could conclude the removal from service was pretextual. Both parties' motions for summary judgment on this claim are denied.

### 2.     The sleep apnea issue

Both Self and BNSF have moved for summary judgment on Self's claim BNSF discriminated against him by requiring Self provide additional information about his sleep apnea before he could

be cleared to return to service.  This claim, like Self's removal-from-service claim, implicates the

ADA's prohibition against discriminatory medical inquiries.  *See* 42 U.S.C. § 12112(d)(4)(A).

BNSF, unsurprisingly, argues its inquiries regarding Self's sleep apnea and its requirement

he produce the results of a sleep study before being cleared to return to service were job-related and

consistent with business necessity.  BNSF states untreated sleep apnea can cause "excessive daytime

sleepiness, fatigue, and inattentiveness," all of which "pose[] a significant threat to the safety of a

rail yard employee and others around him or her" given the potential for rail cars and other rail yard

equipment to seriously injure or even kill an employee or other worker.  Def.'s Mot. Summ. J. [#24]

at 17.  BNSF points out after learning of Self's sleep apnea, it had no medical information regarding

the condition other than (1) a physician's notation Self had sleep apnea but was not using a CPAP

machine, (2) Self's own statements he no longer suffered from sleep apnea after making certain

lifestyle changes, and (3) a physician's notation indicating Self was "asymptomatic" and that Self

"has a past history of sleep apnea but he has not used the [CPAP] in a long time, in fact, he thinks

he does not have it any more[.]"  Def.'s Mot. Summ. J. [#24-1] Ex. A-18 at 99.  Thus, BNSF claims,

it had the right to require Self to prove either that he no longer suffered from the condition or that

he was compliant with his doctor's recommended treatment.

Self disputes that BNSF had any cause to inquire about his sleep apnea. Self argues he was

working as lead car inspector for BNSF at the time of his diagnosis in February 2008, and from that

date through December 2012, passed every safety inspection he was given and was never

reprimanded about any aspect of his job performance either orally or in writing.  *See* Pl.'s Resp.

[#25] at 10.  BNSF does not dispute these points.  Thus, Self argues, BNSF merely "decided to

categorize [him] as having a 'sleep disorder'" because of the 2008 diagnosis, which in Self's view is precisely the sort of discrimination prohibited by the ADA.

As the Second Circuit has noted, federal courts have found business necessity existed to justify a medical inquiry where an employer has "legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties (such as frequent absences or a known disability that had previously affected the employee's work)[.]" *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 98 (2d Cir. 2003). The standard may be met, however, "even before an employee's work performance declines if the employer is faced with 'significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job.'" *Brownfield*, 612 F.3d at 1146 (quoting *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999)). Here, because it is undisputed Self never exhibited symptoms or behaviors at work related to his sleep apnea, Self's case falls into this latter category. The question thus becomes whether the physician's notation indicating Self's diagnosis and noncompliance with CPAP treatment constitutes "significant evidence that could cause a reasonable person to inquire" whether Self was still capable of performing his job.

Most of the cases interpreting § 12112(d)(4)(A) involve employees who have exhibited symptoms or behaviors that cause their employers to question their fitness for duty. *See id.* (holding prophylactic psychological examination for police officer who exhibited "repeated volatile responses" to situations consistent with business necessity); *Watson v. City of Miami Beach*, 177 F.3d 932, 934–35 (11th Cir. 1999) (finding fitness for duty examination for police officer who displayed "unusually defensive and antagonistic behavior" consistent with business necessity). In the recent case *Parker v. Carrier Corp.*, however, a Nebraska district court found a trucking

company's blanket policy of testing all its drivers of a certain body mass index for sleep apnea, even if they had exhibited no signs or symptoms of the condition, consistent with business necessity. —F. Supp. 3d.—, 2016 WL 259286 (D. Neb. 2016). The plaintiff-employee in *Parker* was removed from service after refusing to comply with the sleep apnea testing policy, and sued for discrimination under § 12112(d)(4)(A). *Id.* at *4. In finding for the trucking company, the court noted the plaintiff did not dispute that untreated sleep apnea increases the risk of motor vehicle accidents caused by driver fatigue, acknowledged the trucking company's "vital interest" in keeping its drivers and cargo safe, and stated there was no evidence the policy was inconsistently applied. *See id.* at *8.

Relatedly, in *E.E.O.C. v. Prevo's Family Market, Inc.*, the Sixth Circuit found consistent with business necessity a grocery store's requirement its employee, a produce handler who frequently worked with knives and cut himself in the course of his duties, undergo HIV testing before returning to work. 135 F.3d 1089 (6th Cir. 1998). The employee had previously informed the store he tested positive for HIV. *Id.* at 1091. The store first transferred him to a different position, but ultimately placed him on voluntary paid leave "to get [him] out of the situation of being asked questions [about the reason he was transferred] and to give [the store] a chance to get the information that they needed to properly handle the situation." *Id.* at 1091. The store requested the employee provide a physician's work-up indicating his diagnosis, prognosis, expected treatments, ability to work, and a variety of opinions regarding the possibility HIV could be transmitted in the course of the employee's duties. *See id.* at 1092. The employee did not provide the information, was terminated, and sued under § 12112(d)(4)(A). *Id.*

The Sixth Circuit rejected the employee's ADA claim. *See id.* at 1094. The panel found the store's "business necessity was to protect the health of [the employee], its other employees and the

-28-

general public from HIV infection." *Id.* Because produce handlers frequently cut themselves, the panel reasoned, the store "needed to verify [the employee's] condition" for safety purposes. *Id.* Further, the panel explained, the store's "behavior is not based on a mere suspicion that [the employee] may be sick. Rather, [the employee] . . . directly communicated his alleged HIV status . . . . This is not the sort of unfounded and biased discrimination that the ADA was created to prevent." *Id.*

Following *Prevo's Family Market* and *Parker*, the Court finds BNSF is entitled to summary judgment on Self's claim, as BNSF's request for additional information about Self's sleep apnea diagnosis was consistent with business necessity. Like the *Parker* plaintiff, here, Self does not dispute that "[s]leepiness, fatigue, or loss of attentiveness caused by untreated obstructive sleep apnea poses a significant threat to the safety of a rail yard employee and others around him" given the "inherent size of and motion of rail cars and other equipment in or around rail yards." Def.'s Mot. Summ. J. [#24-5] Ex. E (Clark Decl.) ¶ 4; *id.* [#24] at 17. BNSF clearly has a strong interest in ensuring the safety of its workers. Further, as in *Prevo*, BNSF did not request information about Self's alleged sleep apnea based on a suspicion he might have it. Rather, BNSF's information was based on a recent medical record indicating Self had sleep apnea and was not treating it. BNSF is correct it was not required to rely upon Self's own opinion (or a physician's restatement of Self's opinion) that he no longer suffered from sleep apnea, and was permitted, for safety reasons, to verify whether the sleep apnea had remitted or not. *See Tice*, 247 F.3d at 517 (finding employer's request employee undergo a medical examination consistent with business necessity where physician's "diagnosis rested largely on [the employee's] own evaluation of his abilities"); *Prevo*, 135 F.3d at 1094.

In sum, the Court finds BNSF's request for additional information regarding Self's sleep apnea diagnosis prior to permitting Self to return to service does not rise to the level of discrimination guarded against by § 12112(d)(4)(A). BNSF is entitled to summary judgment on this claim.

### 3.    The knee braces

Finally, BNSF moves for summary judgment on Self's claim BNSF discriminated against him by requiring him to wear the knee braces all day while he was on duty. Self failed to respond to this argument, and the Court therefore grants BNSF's motion on this ground as unopposed. In any event, the Court agrees with BNSF that a requirement Self wear knee braces at all times while on duty does not rise to the level of an actionable adverse employment action. As such, summary judgment on this claim is appropriate.

### Conclusion

Self's retaliation claim is dismissed for failure to exhaust administrative remedies. BNSF is entitled to summary judgment on all of Self's remaining claims, save the discrimination claim based on BNSF's decision to remove Self from service pending clarification of his knee-related medical issues, which will be tried to the jury.

Accordingly:

IT IS ORDERED that Plaintiff Jeffrey N. Self's retaliation claim is DISMISSED WITHOUT PREJUDICE for failure to exhaust administrative remedies;

IT IS FURTHER ORDERED that Plaintiff Jeffrey N. Self's Motion for Partial Summary Judgment [#20] is DENIED; and

IT IS FINALLY ORDERED that Defendant's BNSF Railway Company's Motion for Summary Judgment [#24] is GRANTED IN PART and DENIED IN PART as described in this opinion.

SIGNED this the 8th day of February 2016.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE